UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
FELICIA GROSS and KENNETH GROSS,

                Plaintiffs,                **OPINION AND ORDER**

  -against-                                        18-cv-3579 (AEK)

DAVID DERHAGOPIAN,

                Defendant.
------------------------------------------------------------------X

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.**[1]

      Plaintiffs Felicia Gross, also known as Joy Gross ("Mrs. Gross"), and Kenneth Gross ("Mr. Gross") (collectively, "Plaintiffs") bring this action against Defendant David Derhagopian ("Defendant"), asserting state law claims for breach of contract and unjust enrichment. ECF No. 36 ("Amended Complaint" or "Am. Compl."). Currently before the Court is Defendant's motion for summary judgment. ECF No. 99. For the reasons that follow, the motion is GRANTED, and the action is dismissed with prejudice.

**I.  BACKGROUND**

      The allegations in the Amended Complaint cover dealings between the parties during a nearly 30-year timeframe between 1985 and in or around 2013. In their respective summary judgment filings, the parties detail numerous disputes about the evolution of their business relationship over this period, including, among other things, fundamental disagreements over

---

[1] On or about February 11, 2019, the parties executed Form AO 85, "Notice, Consent, and Reference of A Civil Action to A Magistrate Judge," consenting to the reassignment of this matter to a United States Magistrate Judge in accordance with 28 U.S.C. § 636(c). The Honorable Kenneth M. Karas endorsed and docketed the form on February 18, 2019, ECF No. 45, and the matter was reassigned to the Honorable Lisa Margaret Smith. The case was reassigned to the undersigned on October 15, 2020.

stock ownership, the validity of alleged stock transfers, and the particular terms and conditions of Defendant's sale of his interests in various corporate entities. While some of the parties' factual disagreements are described here to provide necessary context for Plaintiffs' claims, nearly all of the disputed facts are immaterial to the Court's determination of Defendant's summary judgment motion. Instead, the crux of the matter at this stage is Plaintiffs' allegations regarding a 2006 agreement between Plaintiffs and Defendant, pursuant to which Plaintiffs would be entitled to payment of $3,300,000 from Defendant in or about January 2013 based upon the agreed value of Plaintiffs' ownership interest in the corporate entity that they formed together in 1985. *See* Am. Compl. ¶¶ 13-16.

\* \* \* \* \* \* \* \* \* \*

The following facts are taken from Defendant's Local Civil Rule 56.1 Statement ("Def.'s 56.1"), ECF No. 101, Plaintiffs' Local Civil Rule 56.1 Statement ("Pls.' 56.1"), ECF No. 106-2,[2] and the evidence submitted by the parties in connection with the motion.

On October 15, 1985, an entity named Entec Polymers, Inc. ("EPI") was incorporated under the laws of the State of Florida. Def.'s 56.1 ¶ 1; Pls.' 56.1 ¶ 1.[3] All of the outstanding

---

[2] A duplicate of Plaintiffs' Local Civil Rule 56.1 Statement is filed at ECF No. 107-1.

[3] Plaintiffs maintain that "[e]ven *undisputed* facts in the Movant's Rule 56.1 Statement have citations to documents which lack proper foundation, and should be excluded or stricken, for the reasons set forth in the Plaintiff's Rule 56 Statement and Objections." ECF No. 106 at 1 (emphasis in original). More specifically, Plaintiffs object to many of the exhibits cited in Defendant's Rule 56.1 Statement on the ground that they are inadmissible hearsay not subject to the business records exception to the hearsay rule. *See* ECF No. 106-2 at 9-16. In response, Defendant contends that the exhibits either are not hearsay or fall within the business records exception, citing the "Business Records Declaration of Guy E. Whitesman." *See* ECF No. 112-2; ECF No. 101-1. The Court need not rule on Plaintiffs' objections, however, because Plaintiffs do not dispute the underlying facts set forth in these paragraphs of the parties' Local Civil Rule 56.1 statements, and the Court does not rely on the cited documents for any purpose in resolving this motion.

shares of EPI were initially owned, in equal parts, by Defendant (100 shares), Mr. Gross (100 shares), and a non-party individual named Ed Nassberg (100 shares).  Def.'s 56.1 ¶ 2; Pls.' 56.1 ¶ 2.  Each of these three shareholders initially served as the Directors of EPI.  Def.'s 56.1 ¶ 3; Pls.' 56.1 ¶ 3.  On June 24, 1994, Mr. Gross transferred all of the shares of EPI that he then owned into Mrs. Gross's name; nevertheless, Plaintiffs maintain that they "continued to own the stock as joint property."  Def.'s 56.1 ¶ 9; Pls.' 56.1 ¶ 9.

The parties dispute what occurred over the next decade or so with respect to various business dealings of EPI including (1) EPI's transfer and assignment of its operational assets and liabilities to an entity called Entec Polymers, LLC ("EPL") in mid-1999, with EPI continuing to exist as a holding company and controlling EPL as the sole member and manager of EPL; (2) EPI's sale of part of its membership interests in EPL to a company named Ravago in mid-1999; and (3) Ravago's purported acquisition, prior to 2006, of 49 percent of the membership interests in EPL, with EPI owning the remaining 51 percent of the membership interests.  *Compare* Def.'s 56.1 ¶¶ 15-17 *with* Pls.' 56.1 ¶¶ 15-17.

According to Defendant, on October 10, 2005, the Board of Directors and shareholders of EPI authorized and approved the dissolution of EPI effective January 1, 2006, with all assets of EPI to be distributed to its shareholders on or before that date; Plaintiffs assert that they were never provided with notice of the shareholder resolution regarding the dissolution of EPI, despite being shareholders of EPI at that time.  Def.'s 56.1 ¶ 20[4]; Pls.' 56.1 ¶ 20.  The parties also dispute who owned outstanding shares of EPI stock when the company was liquidated effective January 1, 2006.  According to Defendant, the outstanding shares were owned by him, W. John

---

[4] The signatures on the document cited by Defendant are all dated October 11, 2005.  *See* ECF No. 101-14.

3

Chuplis, Michael Clifton, James P. Ashton, and Charles T. Burke; according to Plaintiffs, however, Plaintiffs themselves also "maintained [their] interest in EPI" at that time. Def.'s 56.1 ¶ 21; Pls.' 56.1 ¶ 21. Defendant asserts, and Plaintiffs dispute, that in 2006, as part of the "liquidation, winding-down, and dissolution" of EPI, Ravago "purchased all of the remaining 51% membership interests in [EPL] from Derhagopian, Chuplis, Clifton, Ashton, and Burke." Def.'s 56.1 ¶ 25; Pls.' 56.1 ¶ 25.

Defendant contends that in 2006, when he sold his membership interests in EPL to Ravago, he received cash—not shares, stock, or membership interests in any entity. Def.'s 56.1 ¶ 26. In contrast, Plaintiffs claim that Defendant told them that in return for his sale of shares of "Entec" (it unclear whether this is a reference to EPI or EPL), Defendant received a form of restricted stock from Ravago that could not be redeemed until at least January 2013. Pls.' 56.1 ¶¶ 26, 31; *see* ECF No. 108 ("K. Gross Depo.") at 159:13-24, 166:19-167:4. Plaintiffs further allege that they understood that upon redemption of Defendant's restricted Ravago stock and Defendant's receipt of the funds from the redemption, Defendant would distribute the proceeds to Plaintiffs. *See* K. Gross Depo. at 159:10-160:16.[5] More specifically, Plaintiffs claim that they had an oral agreement with Defendant for payment of the value of the EPI shares held by Mrs. Gross, which Defendant said were worth $3.3 million, and that Defendant was going to pay them years later, when Defendant left Ravago and finally received payment from the company. K.

---

[5] Contrary to the Amended Complaint, Am. Compl. ¶¶ 14-15, Plaintiffs' interrogatory responses, ECF No. 100-6 ("Pls.' Interrog. Responses") at 2-3 (Response to Interrogatory No. 6), and Mr. Gross's declaration submitted in opposition to this motion, ECF No. 106-3 ("K. Gross. Decl.") ¶¶ 13-14, 17, 25, 29, Mr. Gross testified at his deposition that Defendant was supposed to pay Plaintiffs in *2011* instead. *See* K. Gross Depo. at 160:6-7, 21-23; 161:2 (the oral agreement was made in 2006, and Defendant "was supposed to get payment [from Ravago] some five years later. . . . It was at that point that I finally tried to reach [Defendant], and for whatever reason, he never answered the phone. . . . [o]ver 2011, 2012, 2013."). This discrepancy is not material for purposes of Defendant's summary judgment motion.

4

Gross Depo. at 159:10-160:25; *see* Am. Compl. ¶¶ 13-15.  Defendant contends, in contrast, that Mrs. Gross sold all of her shares of EPI in 2001, *see* ECF No. 100 at 5-6 & Exs. 1-5, disputes that he entered into any such oral agreement with Plaintiffs, and notes that Plaintiffs never sent him any documentation confirming their alleged oral agreement, and, in fact, have produced no documentation at all in this litigation, *id.* at 8-9 & Ex. 7.

The parties do not dispute that Defendant continued his employment with EPL and Ravago following the 2006 transaction.  Def.'s 56.1 ¶¶ 27-28; Pls.' 56.1 ¶¶ 27-28.  But Defendant maintains, and Plaintiffs dispute, that he "did not receive any shares, stock, or membership interests in [EPL] or any Ravago-related entity" in consideration for his employment as EPL's President and Ravago's President/CEO.  Def.'s 56.1 ¶ 29; Pls.' 56.1 ¶ 29.  According to Defendant, he retired in December 2011 and stopped working for EPL and Ravago; upon his retirement, he did not receive any deferred compensation or any shares, stock, or membership interests in any entity, including any Ravago-related entity.  Def.'s 56.1 ¶¶ 30-31.  Plaintiffs contend, in contrast, that Defendant told them in 2008 that he was receiving stock from Ravago which was restricted and could not be redeemed until at least January 2013.  Pls.' 56.1 ¶ 31.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 320-23 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor."  *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 97 (2d Cir. 2001); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir. 1998); *see also Anderson*, 477 U.S. at 261 n.2.  A party cannot overcome summary judgment by relying on "mere speculation or conjecture as to the true nature of the facts" because "conclusory allegations or denials" cannot "create" genuine disputes of material fact "where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks omitted).  "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."  *Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir. 1992) (quoting *H.L. Hayden Co. v. Siemens Med. Sys. Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989)).

    **B.**    **Choice of Law**

Subject matter jurisdiction in this case is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1): Plaintiffs are citizens of New York, and Defendant is a citizen of Florida.  Am. Compl. ¶¶ 2-3; ECF No. 39 (Answer) ¶¶ 2-3.  "Ordinarily, in a diversity case, the Court must apply the choice of law rules of the forum state to determine which state's substantive law should be applied."  *Neal v. Asta Funding, Inc.*, No. 13-cv-2176 (VB), 2014 WL 3887760, at *2 (S.D.N.Y. June 17, 2014).  "However, where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."  *Id.* (quotation marks omitted).  In his motion papers, Defendant applies the law of the forum state—New York; Plaintiffs make no argument concerning the applicable law in their opposition papers, but do argue against Defendant's interpretation of New York law with respect to unjust enrichment and cite New

6

York law elsewhere. *See* ECF No. 106-1 ("Mem. in Opp'n") at 18-19. Accordingly, the Court deems the parties to have consented to the application of New York law. *See Neal*, 2014 WL 3887760, at *2.

### C. Breach of Contract

Plaintiffs' first cause of action—for breach of contract—is barred by New York's Statute of Frauds. "New York law provides that an agreement will not be recognized or enforceable if it is not in writing and 'subscribed by the party to be charged therewith' and if the agreement '[b]y its terms is not to be performed within one year from the making thereof.'" *Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007) (quoting N.Y. Gen. Oblig. Law § 5-701[a][1]); *see Sequoia Healthcare Servs., LLC v. Essex Cap. Corp.*, 763 F. App'x 13, 15 (2d Cir. 2019) (summary order). "This provision of the Statute of Frauds encompasses 'only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year.'" *Guilbert*, 480 F.3d at 151 (quoting *Cron v. Hargro Fabrics, Inc.,* 91 N.Y.2d 362, 366 (1998)). "Thus, 'full performance by all parties must be possible within a year to satisfy the Statute of Frauds.'" *Id.* (quoting *Cron*, 91 N.Y.2d at 368).

In the Amended Complaint, Plaintiffs allege:

> 13. In or about early 2006, Defendant received an offer from Ravago for the sale and purchase by Ravago, of Entec Polymers in full. Following negotiations, Defendant agreed that Entec Polymers would be sold and acquired by Ravago. The sale of Entec Polymers to Ravago was scheduled for August of 2006.
>
> 14. Separate and apart from Ravago's agreement to purchase the ownership interest in full of Entec Polymers – which encompassed and included the Ravago's [sic] purchase of ownership interests held by Goldmark and Duffy – relevant specifically as to Defendant's sale of his ownership interest in Entec Polymers to Ravago, it was agreed, as a condition to that portion of the sale that Defendant in lieu of receiving payment in full upon sale, and at the time of transfer would receive payment by way of an assignment of Ravago stock – restricted and

7

> conditioned upon the agreement that the Ravago stock could only be converted to cash, by Defendant, on a future date which was indicated by Defendant to Plaintiffs as a date not before January of 2013. Commencing the date of the sale, Defendant remained on-board with Rovago [*sic*] as Ravago's Chief Executive Officer.
>
> 15. Therewith, by agreement between Plaintiffs and Defendant, in order to facilitate the Revago [*sic*] Sale, it was agreed between Plaintiffs and Defendant that Plaintiffs' entitlement would be the sum of $3,300,000.00, the amount of which was based upon the agreed value of Plaintiffs' ownership interest in Entec Polymers, and would be due and paid to Plaintiffs by Defendant upon Defendant converting the Ravago stock to cash sometime after January of 2013, the date previously indicated to Plaintiffs by Defendant.
>
> 16. Beginning in March of 2013, Plaintiffs began attempts to contact and communicate with Defendant, in connection with payment of the agreed upon $3,300,000.00, all to no avail. Despite repeated efforts over the following years thereafter, to contact Defendant, no response from Defendant resulted. To date, Defendant refuses and continues to refuse to satisfy Defendant's financial obligation to Plaintiffs.

Am. Compl. ¶¶ 13-16. There is no other alleged "agreement" between Plaintiffs and Defendants set forth in the Amended Complaint to support Plaintiffs' specific prayer for relief of $3.3 million in compensatory damages for their breach of contract claim. *See* Am. Comp., Prayer for Relief ¶ 1.

Moreover, Mr. Gross testified regarding the parties' oral agreement at his deposition, explaining that the agreement

> was that when the shares of stock in Entec were going to be traded, assigned, sold or whatever to Ravago and when David Derhagopian received payment and all the other – as I understood it, the payment would go to him and he would distribute the funds at that point. And he specifically stated that at that time the shares held by Joy Gross were worth 3.3 [million dollars], and I could only be wrong by a small amount relative to the total sum. It could have been 3.2. It could have been 3.1. It could have been three or 3.3. At this moment, my recollection is 3.3 million.
>
> Q. And when . . . do you contend that oral agreement was made?

8

> A. When [Defendant] indicated to me verbally over the phone that this transaction was going to take place.
>
> Q. And so based on that, this would have happened sometime in 2000 and –
>
> A. '6 or something like that. He was supposed to get payment some five years later. That's what I was told at the time. And at that time, . . . he was going to continue on as president of the organization for a time. . . . He indicated that when he finally left the company, that's when he would get paid in cash.
> . . .
>
> A. . . . He was getting paid from Ravago for his interest when he finally left the company.

K. Gross Depo. at 159:13-160:21; *see also id.* at 162:2-5.

Furthermore, Plaintiffs were asked via interrogatory to "identify each agreement by and between [P]laintiffs and [D]efendant related to or supporting [P]laintiffs' claims in this lawsuit." K. Gross Depo. at 163:17-20.[6] Plaintiffs' response, verified by Mr. Gross, was as follows:

> The agreement entered into between Plaintiffs and Defendant was oral in nature. Plaintiffs and Defendant, in or about August of 2006, in order to facilitate a sale of the business known as Entec Polymers to a purchaser, Revago [*sic*], it was agreed between Plaintiffs and Defendant that Plaintiffs' entitlement for monies due to Plaintiffs in connection with Plaintiffs' ownership interest in Entec would be for the sum of $3,300,000.00—the amount of which was based upon the agreed value of Plaintiffs' ownership interest in Entec Polymers between Plaintiffs and Defendant. It was agreed by the parties, based upon determined value of Plaintiffs' ownership interest in Entec, Plaintiffs would surrender their ownership interest in Entec to Defendant and in connection with the surrender, Plaintiffs would later be entitled to an would be paid $3,300,000.00 by Defendant, upon and at the time Defendant was first permitted [by Ravago], in or about January 2013, to convert certain restricted stick which Defendant received [from Ravago] as consideration for the sale of Entec to Ravago.

---

[6] Plaintiffs' interrogatory responses (ECF No. 100-6) did not restate each interrogatory before providing the response. During Mr. Gross's deposition, however, Defendant's counsel read Interrogatory No. 6 into the record and questioned Mr. Gross about the response to that interrogatory.

9

ECF No. 100-6 (Pls.' Interrog. Responses) at 2-3 (Response to Interrogatory No. 6).  Plaintiffs' description of the agreement in the interrogatory response is fully consistent with the allegations in the Amended Complaint and Mr. Gross's deposition testimony.  Again, there is no reference, in response to this clear and directly stated interrogatory, to any other allegedly relevant "agreement" between Plaintiffs and Defendants for purposes of this lawsuit.

Put simply, Plaintiffs' own theory of the case—from the time of the filing of the Amended Complaint—is that Plaintiffs entered into an oral contract with Defendant in or about 2006, with full performance anticipated to occur in or about 2013.  The agreement was not in writing, was not "subscribed by the party to be charged therewith," N.Y. Gen. Oblig. Law § 5-701[a][1], and could not, by its terms, be fully performed for many years—certainly there was absolutely no possibility of full performance within one year.  Under these circumstances, the Statute of Frauds plainly precludes enforcement of the purported contract between Plaintiffs and Defendant.

In opposition to the motion for summary judgment, Plaintiffs claim that "[t]here has been a lot of discussion whether the dispute is over an oral contract between Defendant Derhagopian and Plaintiff Kenneth Gross . . . or written contracts—stock purchase agreements—between him and Mrs. Gross in 2002." Mem. in Opp'n at 4.  But there are no allegations whatsoever in the Amended Complaint regarding the existence of a written contract pursuant to which Defendant was to transfer to Plaintiffs $3.3 million for the value of Plaintiffs' ownership interest in Entec Polymers.  *See* Am. Compl. ¶ 15.  It is only now, in attempting to overcome Defendant's summary judgment filing, that Plaintiffs assert the existence of a supposedly pertinent written contract between the parties—the Stockholders' 1996 Buy-Sell Agreement—which "requires stock to be sold according to its terms." Mem. in Opp'n at 4-6.

But "Plaintiffs cannot survive a summary judgment motion by contradicting their own pleadings in an effort to raise a genuine issue of fact." *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-cv-10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004); *cf. id.* ("Plaintiffs expressly identified, in the amended complaint, that the December 4th letter of intent was the contract at issue, and described that contract as a joint venture agreement. Those factual allegations are judicial admissions that bind plaintiffs throughout the course of the litigation."). "A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion." *Id.* Because there are no allegations in the Amended Complaint regarding the Stockholders' 1996 Buy-Sell Agreement or any written contract between Defendant and Mrs. Gross in 2002, any claims regarding alleged breaches of such agreements are not properly before the Court. *See id.* (determining that at the summary judgment state, plaintiffs were "precluded from now alleging the existence of other written and oral binding contracts").

In addition, Plaintiffs cannot raise issues of fact by making new statements in sworn declarations submitted in opposition to the motion that entirely contradict the discovery record in the litigation. Under the sham affidavit doctrine, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014) (quotation marks omitted). "Courts in the Second Circuit are particularly reluctant to credit affidavit testimony that alleges critical, obviously material facts that were not mentioned at deposition, noting that such circumstances strongly suggest a sham affidavit." *Chen v. Matsu Fusion Rest. Inc.*, No. 19-cv-11895 (JMF),

2022 WL 3018105, at *4 (S.D.N.Y. July 29, 2022) (quotation marks omitted). "Put differently, 'factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial.'" *Id.* (quoting *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). "Thus, 'statements in an affidavit filed in response to a summary judgment motion [do] not create material factual disputes where none existed without such affidavit.'" *Id.* (quoting *Hayes*, 84 F.3d at 619).

Mr. Gross's declaration unquestionably constitutes a sham affidavit and cannot be used to raise a genuine issue of material fact as to whether the parties' contract was written and not oral.[7] Most critically, Mr. Gross's above-referenced deposition testimony regarding the parties' agreement—testimony that is consistent with the Amended Complaint and Plaintiffs' interrogatory responses—stands in stark contrast to his sworn declaration submitted in opposition to the motion, which states instead that

---

[7] Defendant cites other contradictions between Mr. Gross's deposition testimony and his sworn declaration related to when Plaintiffs were to be paid and when they began their attempts to contact Defendant about being paid. *See* Reply Mem. at 3. These contradictions—particularly the discrepancy as to whether Defendant was to pay Plaintiffs in 2011 or 2013—are irrelevant to the issue of whether the parties' agreement is barred by the Statute of Frauds, because even if payment was to have been made in 2011, the oral contract would still not have been performable within one year.

Also irrelevant are any disputes regarding whether Mrs. Gross's shares of EPI were actually sold in 2001 or 2002. *See* Mem. in Opp'n at 11-14. Plaintiffs maintain that Mrs. Gross did not sell her shares in 2001 or 2002, and the Court views these facts in the light most favorable to the Plaintiffs for purposes of addressing this motion. Yet assuming that Mrs. Gross continued to hold EPI shares until 2006, such that there was reason to enter into an oral agreement with Defendant regarding payment for those shares, that oral agreement is still barred by the Statute of Frauds.

Finally, Plaintiffs' assertions that their signatures were forged on certain EPI corporate documents, *see* K. Gross. Decl. ¶¶ 3, 18 & Ex. B, are irrelevant to the issues in this case as presented in the pleadings. All of the documents in question pre-date, and are unrelated to, the 2006 oral agreement which is the basis for Plaintiffs' claims.

12

> [t]he terms of my agreement with [Defendant] were memorialized in the Stockholders' Agreement we agreed to, but I did not personally sign, in 1996.  It replaced a Stockholders' Buy-Sell Agreement of 1989 agreement we all signed in 1989, which would be binding if it were not replaced by the 1996 Agreement.  The 1996 Agreement required us to sell shares according to its terms, and allowed an Active Shareholder like [Defendant] to purchase them with a lump sum in cash, or in equal installments (plus interest) spread over 40 quarters (10 years).  That would be over $330,000 per year for 10 years, and based on what [Defendant] told me at the time, I believed it was a fair value as defined in both agreements.

K. Gross. Decl. ¶ 22 (footnotes omitted); *compare* K. Gross Depo. at 159:25-160:3, 163:7-13 (testimony regarding the parties' oral agreement).  There is no evidence in the discovery record regarding the purported significance of the 1996 agreement to Plaintiffs' claim for $3.3 million in relief, or the alleged applicability of that agreement to the issues in this case.  When asked about the parties' "agreement" at his deposition, Mr. Gross described the 2006 oral agreement— the same oral agreement that is alleged in the Amended Complaint—and not a complex, multi-year application of a 1996 agreement that provided general parameters for the sale of stock.  In short, Plaintiffs' attempt to create an issue of fact by referring in Mr. Gross's declaration to an agreement that is not referenced in the pleadings or in the discovery record is not sufficient to raise a genuine issue for trial.  *See Chen*, 2022 WL 3018105, at *4.

At bottom, Plaintiffs raise no genuine issue of material fact regarding the applicability of the Statute of Frauds to the parties' 2006 oral agreement.  As alleged in the Amended Complaint, stated in Plaintiffs' interrogatory responses, and testified to by Mr. Gross, the parties' contract was oral and not performable within one year.  Plaintiffs have failed to produce any viable evidence to the contrary.  Accordingly, Plaintiffs' breach of contract claim is barred by the Statute of Frauds, and Defendant is entitled to summary judgment on this claim.

13

### D. Unjust Enrichment

"While the Statute of Frauds is not an automatic bar to a cause of action for unjust enrichment, a plaintiff cannot recover damages that are dependent upon an oral agreement otherwise barred by the Statute of Frauds." *Sequoia Healthcare Servs., LLC*, 763 F. App'x at 16 (cleaned up). Here, it is apparent from the face of the Amended Complaint that Plaintiffs' claim for unjust enrichment is based upon the same allegations as their claim for breach of the parties' oral contract. *See* Am. Compl. ¶¶ 20-23; *see also id.* ¶ 21 ("As a result of the wrongful actions of the Defendant as described herein, Defendant failed and refused to make restitution to Plaintiffs *as agreed* of and for the proceeds of which Defendant received in connection with the sale of the Entec Polymer business, the same proceeds of which Defendant has wrongfully converted to his own use.") (emphasis added). Plaintiffs "may not escape the Statute of Frauds by labeling [their] contract claim 'unjust enrichment' . . . ." *Sequoia Healthcare Servs., LLC*, 763 F. App'x at 16.

Accordingly, Defendant is entitled to summary judgment on Plaintiffs' unjust enrichment claim as well.[8]

---

[8] Because the Court grants summary judgment as to both claims based on the Statute of Frauds, it need not address Defendant's arguments regarding the applicability of the statute of limitations or whether Mr. Gross is an appropriate party in this action.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 99) is GRANTED, and the action is dismissed with prejudice. The Clerk of Court is respectfully directed to enter judgment in favor of Defendant.

Dated: March 8, 2023
       White Plains, New York

                                             **SO ORDERED.**

_____
ANDREW E. KRAUSE
United States Magistrate Judge